UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80083-CR-ROSENBERG

UNITED STATES OF AMERICA

vs.

CRAIG SHERMAN,

   Defendant.

_____/

**PLEA AGREEMENT**

The United States Attorney's Office for the Southern District of Florida ("this Office") and defendant CRAIG SHERMAN (hereinafter referred to as the defendant"), enter into the following agreement:

1.  The defendant agrees to plead guilty to Counts 1 and 2 of the Indictment which charge him with wire fraud , in violation of Title 18, United States Code, Section 1343.

2. The United States agrees to dismiss the remaining counts of the indictment after sentencing

3.  The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the probation office, which investigation will commence after the guilty plea has been entered.  The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence

1

under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that as to Counts 1 and 2, the Court may impose a statutory maximum term of imprisonment of up to 20 years, followed by a term of supervised release of up to 3 years, and may impose a fine of up to $250,000, and may order restitution.

5. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $200 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If the defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. The United States agrees that it will recommend at sentencing that the court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will recommend an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make these recommendations if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously

3

acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

9. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty, the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that the plea may entail, even if the consequence is the defendant's automatic removal from the United States.

10. The defendant agrees to pay restitution to Victims 1 and 2 as identified in the Indictment as follows:

a. V1 is owed restitution in the amount of $3,839,000. (Defendant has already repaid $336,000 to V1, reducing restitution owed to this amount).

b. V2 is owed restitution in the amount of $3,735,000. (If it is determined that defendant has already repaid a portion of the restitution to V2, that amount will be deducted from the total amount of restitution owed.)

11. This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations or understandings.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 8/4/23        By: *[signature]*
                    LAURENCE M. BARDFELD
                    ASSISTANT UNITED STATES ATTORNEY

Date: 8/7/23        By: *[signature]*
                    DOUGLAS DUNCAN, Esquire
                    ATTORNEY FOR DEFENDANT

Date: 8/7/23        By: *[signature]*
                    CRAIG SHERMAN
                    DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80083-CR-ROSENBERG

UNITED STATES OF AMERICA

vs.

CRAIG SHERMAN,

   Defendant.
_____/

**FACTUAL PROFFER**

If this case were to proceed to trial, the United States would prove beyond a reasonable doubt that

CRAIG SHERMAN was an attorney in Boca Raton, Florida, who also worked as the town attorney for the Town of Bay Harbor Islands, Florida.  SHERMAN solicited V1 to invest in real estate projects that were planned or in progress in the Town of Bay Harbor Islands. He advised V1 that he would be loaning money for construction projects, and he would be paid between 6 % to 8 % interest annually for the loan. Promissory notes were done.  The principal would be returned at a later date, usually when the construction project was completed.  Instead of using V1's money to fund the construction projects – like he claimed he would - SHERMAN used it to pay for his personal expenses and to try to keep his law firm running. SHERMAN solicited V2 to provide him money to invest and she would be paid 6% to 8% interest annually with the principal to be paid at a later date per the promissory notes   SHERMAN used V2's monies to pay for his personal expenses and to try to keep his law firm running.   He also used some of V1 and V2's monies to cover payments due to each V1 and V2.

1

SHERMAN had a longstanding attorney-client relationship with V1, an entrepreneur who owned various businesses. V1 had been SHERMAN's client since 1986. They also became good friends. SHERMAN did various types of legal work for V1 over the years and continued to serve as his lawyer until the fraud was uncovered.   V2 was also a friend of SHERMAN's and he did some legal work for her.

A financial analysis showed that SHERMAN was running a *Ponzi* scheme, using money from V1 and V2 to pay back each other, or on some occasions paying back the same investor with his or her own money. SHERMAN had three main bank accounts at Bank of America.  He maintained a Florida IOTA Trust Account for the law firm Sherman & Sherman. P.A.  That bank account ended in #9382.  The investment money went directly into this account.

The fraud scheme was uncovered when SHERMAN advised V1 that the city had placed a moratorium placed on one of the real estate projects that were being built in Bay Harbor Islands. SHERMAN advised V1. that the interest payments would not be paid until the moratorium was over, but SHERMAN assured V1 not to worry and that back interest would be paid at the conclusion of the moratorium.  V1 decided to contact the Bay Harbor Islands Building and Zoning Department and learned there was no moratorium, and the projects were going forward as planned.  One of the projects was almost compete yet V1 had stopped receiving interest payments months earlier.  V1 tried to contact SHERMAN about the investments and the status of the real estate projects.  Finally, when V1 confronted SHERMAN about the investments, SHERMAN told him that he "screwed him".  SHERMAN admitted that he never purchased any rights or provided any loans for the construction projects in Bay Harbor Islands.  SHERMAN told V1 that the money went to pay off his personal debts as well as pay his personal expenses. SHERMAN offered V1 a repayment plan of monies taken.

In late 2019, V2 read an article in the newspaper that implicated SHERMAN in an investment fraud scheme. V2 confronted SHERMAN about the article. SHERMAN advised V2 that the media mischaracterized the situation and assured V2 that her investments were safe. V2 then told SHERMAN she wanted her money back. SHERMAN told her that he would return her monies as per the promissory notes.

A financial analysis was completed by the FBI. The analysis revealed that the investment money was deposited into SHERMAN's IOTA account. The analysis focused on 8 specific deposits (six via wire transfer from V1, and two via check from V2.) and followed the money.

As to Count 1, on June 4, 2018, SHERMAN received a $250,000 wire transfer (investment) from V1 into his IOTA account. At the time of the wire transfer, SHERMAN had $11,000 in his IOTA account. After the deposit he had $261,000. SHERMAN wrote five $10,000 checks totaling $50,000 issued to Craig Sherman. Four of those checks were deposited into his joint personal bank account and was used for personal expenses. SHERMAN also wired $20,000 to his son. SHERMAN wired $90,000 to V1 for a payment on a previous investment (thereby paying him back with his own money). SHERMAN also made four $10,000 transfers (totaling $40,000) to the Sherman & Sherman operating account ending in 4471, to keep the law firm running

As to Count 2, on July 17, 2018, SHERMAN deposited a $500,000 check as an investment from V2. Out of that $500,000 investment, SHERMAN wired $400,000 to V1 for payment for one of his previous investments. He also wrote two checks totaling $50,000 that went into his personal bank account that were used to pay personal expenses. From his personal account he paid back V2 and her ex-husband from a previous investment.

These events occurred in the Palm Beach County, in the Southern District of Florida and elsewhere.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 8/4/23

By: *(signature)*
LAURENCE M. BARDFELD
ASSISTANT UNITED STATES ATTORNEY

Date: 8/7/23

By: *(signature)*
DOUGLAS DUNCAN, Esquire
ATTORNEY FOR DEFENDANT

Date: 8/7/23

By: *(signature)*
CRAIG SHERMAN
DEFENDANT

4